Murl W. Garrett v. Commissioner. Marilyn M. Garrett v. Commissioner.
Garrett v. Commissioner
Docket Nos. 1944-66 and 4345-66.
United States Tax Court
T.C. Memo 1968-51; 1968 Tax Ct. Memo LEXIS 249; 27 T.C.M. (CCH) 271; T.C.M. (RIA) 68051; March 27, 1968. Filed *249 Murl W. Garrett, pro se, 2537 Avenel Dr., Farmer's Branch, Tex. W. H. Cathey, for petitioner Marilyn M. Garrett. Marvin G. Kramer, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income taxes of petitioner Murl W. Garrett for the calendar years 1963 and 1964 in the amounts of $119.40 and $120.83, respectively, and determined deficiencies in the income taxes of petitioner Marilyn M. Garrett for the calendar years 1963 and 1964 in the respective amounts of $262.78 and $245.41. The only issue for decision is whether petitioner Murl W. Garrett or petitioner Marilyn M. Garrett is entitled to the dependency exemption for Melinda Frances Garrett for each of the calendar years 1963 and 1964. Findings of Fact Some of the facts have been stipulated and are found accordingly. Murl W. Garrett (hereinafter referred to as Murl) resided at the time of the filing of his petition in these cases in Dallas County, Texas. He filed his individual Federal income tax returns for the calendar years 1963 and 1964 with the district director of internal revenue at Dallas, Texas. Marilyn M. Garrett (hereinafter *250 referred to as Marilyn) resided at the time of the filing of her petition in these cases in Dallas County, Texas. Marilyn filed her individual Federal income tax returns for the calendar years 1963 and 1964 with the district director of internal revenue at Dallas, Texas. Prior to July 31, 1962, Marilyn and Murl were married. Their daughter, Melinda Frances Garrett (hereinafter referred to as Melinda) was born on December 23, 1959. Murl and Marilyn were divorced on July 31, 1962, and under the divorce decree Marilyn was awarded custody of Melinda. During the years 1963 and 1964 Melinda lived with Marilyn in an apartment which adjoined the apartment of Marilyn's mother, Mary Frances Moore (hereinafter referred to as Mary). During the years 1963 and 1964 Murl paid through the Registry of the Dallas County Support Department the total sums of $725 and $828, respectively, for the support of Melinda. The apartment in which Marilyn and Melinda lived was owned by Mary. Mary was confined to a wheelchair and Marilyn felt that it was necessary that Mary have some adult with her at all times. Marilyn also felt that while she was away at work it was necessary to have someone other than *251 Mary to assist in the care of Melinda. There was a connecting door between Mary's apartment and the apartment in which Marilyn and Melinda lived. This door could be left open so that one person could care for both Mary and Melinda while doing general housework in either apartment. Marilyn's apartment consisted of a living room, another room that was used for a dining room as well as a general purpose room, a kitchen, a den, a bedroom, and a bath. Mary's apartment consisted of two rooms and a bath. Marilyn and Mary had an agreement that Marilyn would not pay rent in cash for her apartment, but instead would pay for groceries for Mary as well as for herself and Melinda and would also pay for the utilities for both her own and Mary's apartments and the cost of a domestic worker to assist Mary, look after Melinda, do the housework in both apartments, and do the washing and ironing and cook the noonday meal for Mary, Marilyn, and Melinda. Included in the utilities bills to be paid by Marilyn were the cost of gas, electricity, 272 water, and a telephone which was in Mary's apartment. Marilyn had no telephone in her own apartment but at times she did use the telephone in Mary's *252 apartment. For the year 1963 Marilyn paid $1,032.73 for groceries for herself, Melinda, Mary, and the domestic worker's noonday meal. Also included in the amount Marilyn paid for groceries were such items as household cleaning supplies and similar household items. She paid $1,883.70 as wages and social security for a domestic worker and $315.32 for utilities. During the year 1963, Marilyn paid $2.74 as church contributions for Melinda, $27.14 for medical expenses and $55.08 for hospitalization insurance for Melinda, $134.31 for clothing for Melinda, and $20 for Melinda's entertainment. For the year 1964 Marilyn spent $1,147.25 for groceries for three meals a day for herself, Melinda, and Mary, the noon meal for the domestic worker, and household items, $1,883.70 for wages and social security for the domestic worker, and $324.92 for utilities for the two apartments. In 1964 Marilyn paid $2.62 for church contributions for Melinda, $30.70 for medical expenses and $55.08 for hospitalization insurance for Melinda, and $156.12 for clothing for Melinda. Marilyn came home and ate her noonday meal with Mary and Melinda. The domestic worker had her noonday meal in Marilyn's apartment. *253 The domestic worker arrived at Marilyn's apartment at about 8 o'clock in the morning after Marilyn, Melinda, and Mary had eaten breakfast. She left at about 5 o'clock in the afternoon when Marilyn returned from work. Marilyn prepared a light evening meal for herself, Mary, and Melinda. The major meal of all three of them was the noonday meal. Generally Melinda would have the same breakfast as Marilyn and Mary, but at the other meals she ate only about half as much as Marilyn and Mary. There was only one water meter for the two apartments. There were separate meters for electricity and gas in the apartments. However, Marilyn did not keep separate records of the amount paid as utilities for each of the apartments. Generally, the domestic worker would spend most of the morning in Marilyn's apartment cleaning the apartment and fixing the noonday meal and would spend most of the afternoon in Mary's apartment cleaning that apartment. The domestic worker, in addition, would do washing and ironing, supervise Melinda, and wait on Mary. While it was necessary to have someone with Mary all the time, Mary did not need constant attention. The fair rental value of the apartment occupied by *254 Marilyn and Melinda was $75 a month during the years 1963 and 1964. Ultimate Fact Marilyn contributed over one-half of Melinda's support for the calendar year 1963, and Murl contributed over one-half of Melinda's support for the calendar year 1964. Opinion Marilyn kept excellent records of her total expenditures for groceries, cost of domestic worker, total utilities bills for her apartment and Mary's apartment, as well as complete records of amounts expended specifically for Melinda. She kept no detail of the actual activities of the domestic worker, the amounts spent for various types of foods such as coffee compared to milk, or the utility charges for each utility in each apartment. This type of information would make the problem of determining the portion of the total expenses applicable to Melinda less difficult. Marilyn was an honest and sincere witness. She freely admitted that she had to have a domestic worker to stay with her mother while she worked and that the domestic worker spent time looking after Mary, cleaning Mary's apartment and washing and ironing for Mary, as well as looking after Melinda and cooking for the three of them. She stated that in her own opinion *255 one-third of the domestic worker's time should be allocated to Melinda. A schedule which she produced allocated one-half of the domestic worker's time to Melinda. Marilyn stated that this allocation was made for her by an employee of the Internal Revenue Service, and that in her opinion he allocated too high a portion of the domestic worker's time to Melinda. Respondent, in his brief, argues that onethird of the domestic worker's time should be allocated to Melinda, one-third to Mary, and the other third to housework, and that one-third of the portion allocated to housework should be allocated to Melinda. Marilyn's testimony is that while the domestic worker spent approximately one-half of her time in the apartment which she and Melinda occupied and one-half in the 273 apartment which Mary occupied, she did the cooking of the noonday meal in the morning in the apartment occupied by Marilyn and Melinda. For this reason we cannot agree with respondent's allocation but have taken Marilyn's estimate that one-third of the total amount paid for domestic help should be allocated to Melinda. Respondent allocated one-sixth of the grocery bills to Melinda and this allocation has some *256 basis in the testimony of Marilyn that Melinda ate, except for breakfast, about one-half of the amount which she, Mary, and the domestic worker had for their meals. We have, therefore, accepted this suggested allocation of respondent's as the best available from this record. Respondent allocated one-third of the utility bills to Melinda. However, Marilyn's testimony was that the utility payments included the cost of a telephone which was in Mary's apartment and other utilities for both apartments. Marilyn stated that she "didn't have a phone." Considering Marilyn's testimony, in our opinion a more reasonable allocation of the utility costs is that one-fourth of the total amount paid by Marilyn is part of Melinda's support. In accordance with the allocation suggested by respondent, we have considered one-half of the $75 per month fair rental value of Marilyn's apartment to be part of Melinda's support. The result of the allocations we have made is that the total amount of Melinda's support in 1963 was $1,568.12 including the $239.27 which Marilyn spent specifically for Melinda. The $725 paid by Murl is less than one-half of Melinda's support for the calendar year 1963, and therefore *257 Marilyn is entitled to a deduction for the dependency exemption for Melinda for 1963. The addition of the amounts which Marilyn spent specifically for Melinda during the calendar year 1964 totaling $244.52 to the amounts of the household expenses which we have allocated to Melinda's support for that year results in the total cost of Melinda's support for the year 1964 being $1,594.85. The $828 contributed by Murl for Melinda's support for the year 1964 is over one-half of Melinda's total support for that year. Therefore, Murl is entitled to the dependency exemption for Melinda for the calendar year 1964. The evidence here does not permit a determination with exactitude of the total cost of Melinda's support for either 1963 or 1964. If either one of the two parties before us in these consolidated cases was the only petitioner, we would decide the case against that petitioner for failure to carry the necessary burden of proof to show the total amount of Melinda's support. However, since we have before us as petitioners the two persons who together paid the total amount of Melinda's support, we have felt impelled to use our best judgment in coming to a conclusion of the total cost *258 of Melinda's support in each year. In arriving at our conclusion, we have considered all the evidence and evaluated the evidence with due regard to the honesty of Marilyn's testimony, as well as to the vagueness of some portions of her testimony and the inconsistencies in her testimony. Decisions will be entered under Rule 50.